UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BERNARD K. POLLARD )<br>)<br>  v. )<br>)<br>INDIANA DEPARTMENT OF CHILD )<br>SERVICES, )<br>)<br>  Defendant. ) | Cause No. 1:20-CV-260-HAB |

## OPINION AND ORDER

Plaintiff, Bernard Pollard ("Pollard"), has a whole heap of opinions, some of which can fairly be described as controversial.[1] He expressed some of those opinions to his coworkers and others while employed as a family case manager ("FCM") with the Indiana Department of Child Services ("DCS"). The last straw came after Pollard made what DCS considered sexually harassing statements and opinions to a college intern. When the intern complained, DCS had enough and terminated Pollard's employment. Pollard, representing himself, filed suit asserting a hodge podge of discrimination claims against DCS. (Compl., ECF No. 1). DCS has moved for summary judgment on all the discrimination claims (ECF No. 54), and the matter is fully briefed (ECF Nos. 56, 63, and 72). Because the Court finds no genuine issues of material fact that preclude summary judgment, DCS's motion will be GRANTED.[2]

**FACTUAL BACKGROUND**

---

[1] For instance, one of the allegations here is Pollard's opinion that women cannot be raped by their husbands. Another one is that homosexuals do not experience discrimination because they choose their sexual preference while black individuals are not able to choose their skin color.

[2] Pollard also moved to compel (ECF No. 61) discovery responses and DCS moved to Strike (ECF No. 66) Pollard's responsive filing to summary judgment. Both motions are denied.

Pollard is a black male in his sixties. He began working for DCS in July 2016 as an FCM in the Dekalb County DCS office. As part of his duties as an FCM, Pollard was required to maintain contact with his assigned families, write reports for the court, attend court hearings and conduct home visits. Pollard had several supervisors during his time at DCS. Josh Ricker ("Ricker") initially supervised him followed by Patricia Lopez. The Local Office Director (LOD) was Wesley Husselman ("Husselman") who was supervised by Regional Director Jamie Pippin ("Pippin").

In February 2018, a foster parent submitted an email complaint to Husselman alleging Pollard was "very loud" and "said some sexist comments" to her during a telephone conversation. (ECF No. 54-2). She stated that she cannot work with Pollard anymore, felt disrespected by him and no longer wished to be a foster parent. (*Id.*). Husselman, joined by Ricker, discussed this situation with Pollard and he denied being disrespectful. A few days later, Pollard received a written counseling reminding him of the "importance of treating all clients, peers, service providers, foster parents and other professional parties with respect and dignity." (Pollard Dep. at 48-49; ECF 54-3 at 1). This counseling reflected the standards and expectations Pollard agreed to when he became employed at DCS.[3] (ECF 54-3 at 3).

In March 2019 Pollard took an intern, Madison McNaughton ("Madison"), on a ride along to a Fort Wayne area school to observe a meeting between a minor child and Pollard. As the two were leaving DCS, they observed women wearing leggings. (Pollard Dep. at 77). Pollard commented to Madison generally that he did not understand why women did not wear a blouse

---

[3] Indiana state employees are governed by a Workplace Harassment and Prevention Policy which references the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act of 1964 (Title VII). The policy strives to establish a workplace where employees are not harassed or discriminated against based on a protected class, and to ensure employees have procedures available so that alleged violations of the policy can be addressed. Employees, including Pollard, also receive sexual harassment training.

to cover their buttocks or midsection when they wear leggings. (*Id.*). Later Pollard expressed the opinion that the "Me Too Movement" was "bologna" (Pollard Dep. at 104) and told Madison that he believed leggings should be part of the dress code and included in the sexual harassment policy. (*Id.* at 104-105). This was one of many opinions Pollard allegedly expressed to Madison during their excursion.

Madison memorialized the events that occurred during this ride along in a Written Statement ("Statement") she provided to DCS after she returned from the trip and complained about Pollard's behavior. (Written Statement, ECF No. 54-6, "Statement at __"). In that Statement, Madison recounted that Pollard posed a few hypotheticals to her and followed up the hypotheticals by asking Madison if she believed the scenario he posed was sexual harassment. For instance, he would say "tell me if you think this is sexual harassment…if some guy came up to you and said 'Girl you fine, you wanna go out with me tonight?'" Madison wrote that when Pollard asked this, he "modeled the movement of checking me out with his eyes up and down." (Statement at 1; Pollard Dep. at 90-91). Madison responded that she believed this was sexual harassment. Pollard then debated with her. When asked about this conversation, Pollard described it in his deposition:

> …We were talking now on what is sexual harassment. And so I was giving her examples of things that do not represent sexual harassment by state law. Because someone asks you out is not sexual harassment. You must tell him no. And then after that …is where if they continue after you tell him no, now it becomes sexual harassment. But when they first come to you, it's no more than them asking you out.

(Pollard Dep. at 88-89). During these discussions, Madison explained that Pollard would "speak with his hands" and tap her left knee with his fingertips. (*Id.*). Madison "did not like that he had been touching my knees so I would re-adjust my legs but he still managed to poke me." (*Id.*).

3

Pollard admits that he may have touched Madison's knee while talking but states that it was unintentional contact.

From there, the conversation took a turn. Pollard claims Madison asked him why black men at her school were hitting on her. Pollard admits in his deposition that he responded to Madison's question by telling her "you're a pretty little girl. In today's society everybody just thinks about sex. Nobody thinks about character anymore. That is the problem that's happening today." (Pollard Dep. at 78). Pollard continued "[t]his is just me talking, you're a beautiful girl. You're blonde, you have a flat stomach, perky, and have a nice butt. You're like a white girl stuck in a black girl's body." (Statement, at 1). Pollard told Madison "back in the day, I was smooth. I had more white women than you have relatives." (*Id.*). Pollard further explained that his wife was a white woman and told Madison "if I wanted to, I could have had you by now, girl." According to Pollard when he said this he "was pandering with her, joking with her." (Pollard Dep. at 93). Pollard does not believe his conversation with Madison was inappropriate but thinks it has been misconstrued and taken apart in bits and pieces. (*Id.* at 88-89).

After returning to DCS, Madison reported her conversations with Pollard to a supervisor who, in turn, reported them to Husselman. At Husselman's request, Madison provided her Statement and Husselman forwarded Madison's Statement to Pippin by email, copying human resources representative Kara O'Dell ("O'Dell").

O'Dell opened an investigation of these events and notified Pollard of the report against him. O'Dell considered the interactions detailed in the report to be allegations of sexual harassment against Pollard. As part of the investigation, Pollard spoke with O'Dell and stated that he was "not trying to get with [Madison]." (ECF 54-8 at 2). Other staff were interviewed as part of the investigation and while they were unaware of the report from Madison, staff did share

concerns about other "controversial" statements Pollard made about women, rape, and other topics. One individual reported that she does not feel safe with Pollard in the office and another coworker told O'Dell that he had concerns with Pollard around female clients. The investigation was documented in an Investigation Report ("the Report") (ECF No. 54-8). The Conclusion and Recommendation section in the Report reads:

> The specific allegation of sexual harassment attributed to Pollard is unsubstantiated; however, witness statements of Pollard's past comments and Pollard's own admission of stating "Back in the day, I was smooth. I had more white women than you have relatives" lend credibility to [Madison's] allegations of inappropriate comments made by Pollard. The statements of [Madison] being "beautiful, blond, had a flat stomach, was perky, and had a nice butt" as well as "like a white girl trapped in a black girl's body" were unwelcomed, unprofessional, and do not meet agency standards.
>
> Due to the egregiousness of Pollard's behavior, [the Indiana State Personnel Department] recommends Pollard be dismissed from State Employment.

(ECF No. 54-8 at 3).

On April 15, 2019, O'Dell notified Husselman and Pippin that the investigation was completed and the recommendation that Pollard be dismissed was approved. (ECF No. 54-13). O'Dell also told them that because of his status as a classified employee[4], Pollard is entitled to a pre-deprivation hearing prior to any discipline being imposed. Pippin conducted a pre-deprivation meeting with Pollard the next day. During the meeting, Pollard believed that his conduct was being "treated like n------ chasing the white woman." (Pollard Dep. at 120, 185-186). After Pollard made this comment, Pippin adjourned the meeting so he could investigate further, reconvening it on April 22, 2019.

> Before reconvening the meeting, Pippin emailed O'Dell, writing:
>
> After continuing to think about this, I have come to the decision that I concur with SPD recommendation [sic] and will be terminating Mr. Pollards [sic] employment on Monday. I have three separate situations (his comments on rape, his

---
[4] A classified state employee is an employee that meets the criteria in Ind. Code 4-15-2.2-4.

5

> conversation with the intern, and his language during the pre-dep) where [he] has clearly demonstrated that he uses offense [sic] language to discussion [sic] his opinions and ideas. Mr. Pollard could have made the same Tuesday argument with me without using any racial slurs, he chose not to. Further, in two of these situations he apologized to people if he offended them, showing to me that he understands that his statements could be taken as offensive. I have a copy of my professional behavior letter that he signed, and he took the harassment training last year, so I can clearly show he knew what DCS and my expectations were.

(ECF 54-15). For these reasons, at the reconvened meeting Pippin terminated Pollard's employment.

Following his termination, Pollard filed a complaint with the Indiana Civil Rights Commission, checking the boxes on the form for sex and race discrimination, and retaliation. Pollard asserted the following:

> On April 22nd 2019, I was terminated.
>
> I have been discriminated against on the basis of my sex, male, race, African American, and subject to retaliation.
>
> On April 3rd I was told Respondent was investigating me for possible sexual harassment. Respondent claims that this was due to comments I made to a coworker, but they were not sexual and my coworker initiated this conversation. My coworker is female, and other female coworkers had made similar comments in the past but none of them were not investigated for sexual harassment. A Caucasian male coworker of mine had been investigated for sexual harassment previously, but he only had to give a statement on the issue, then it was resolved. In my case I gave a statement but Respondent told me they would need a week to investigate the claims. I felt that this case was being investigated in a discriminatory manner, so on April 18th I reported this to the director of Respondent. On the above date Respondent told me that the sexual harassment claim was unsubstantiated, but still terminated my employment. I believe I was terminated in retaliation for reporting the discriminatory investigation.
>
> I am seeking all available remedies for a violation of Title VII of the Civil Rights Act of 1964, as amended, and the Indiana Civil Rights Law.

Pollard received a right to sue letter dated May 27, 2020, and initiated this action on July 14, 2020. In his Complaint, Pollard alleges age, race, sex, and religious discrimination. (ECF No. 1).

## DISCUSSION

a. **Applicable Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the lack of a genuine

issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

b. <u>Analysis</u>

Pollard's Complaint (ECF No. 1) asserts claims of discrimination, including discrimination based on age, race, sex, and religion. At first glance, Pollard's Complaint might also be read to assert a retaliation claim as the retaliation box was checked on his charge of discrimination filed with the Indiana Civil Rights Commission and attached to his Complaint (Compl. at 7). But as DCS is quick to point out, Pollard has seemingly abandoned his retaliation claim and he did not include a claim for age or religious discrimination in his charge of discrimination. See *Delgado v. Merit Systems Protection Bd.*, 880 F.3d 913, 926 (7th Cir. 2018) (a complaint may only include a claim not brought in an EEOC charge if the claim is

7

"reasonably related" to the charges set forth in the EEOC Charge). The Court agrees on both issues.

Although Pollard's charge mentions retaliation and a fair reading of the Complaint might be construed in that way as well, Pollard has not developed this claim in discovery or in response to Defendant's summary judgment filing. Pollard's discovery responses reveal that to the extent he had a retaliation claim he is not pursuing it (ECF No. 43, Interrogatory No. 10, not listing retaliation as one of his claims). Additionally in his deposition, Pollard was asked if his Title VII claim was based on anything else besides race, gender, color and religion, to which he unequivocally answered "No." (Pollard Dep., ECF No. 54-1, at 66). Finally, Pollard does not respond to the Defendant's statement in its brief that "Plaintiff has not asserted a Retaliation claim as part of this federal lawsuit." (ECF No. 56 at 18 n. 8). Thus, the Court finds that in failing to address retaliation, Pollard abandoned any such claim suggested in his Complaint.

Additionally, Pollard has not plausibly explained how age or religion factored into his termination or into the investigation of the complaints of sexual harassment against him. Nor did he amend his charge to include such claims.[5] Thus, he has not explained how any alleged claims of age or religious discrimination are reasonably related to the sexual harassment allegations against him or the investigation by DCS. DCS is entitled, therefore, to summary judgment on Pollard's claims of age and religious discrimination.

Turning now to the nub of this case, Pollard claims that DCS discriminated against him on the basis of race and sex in violation of Title VII. In his charge of discrimination, he complains that DCS treated him differently from other employees at DCS who made comments like his and that when he objected to the investigation, DCS terminated his employment. The

---

[5] Even if he had amended his charge to include age, the Eleventh Amendment bars Pollard's ADEA claim against a state agency, see Gleason v. Bd of Educ., 792 F.2d 76, 79 (7th Cir. 1986).

question before the court is whether the evidence would permit a reasonable factfinder to conclude that Pollard's race, or sex caused his termination. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (applying *Ortiz* to ADEA case). The court considers the evidence as a whole, no matter if it is "direct" or "indirect" evidence. *Ortiz*, 834 F.3d at 765.

The parties have analyzed these claims by "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination" – which remains "an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Id.* Under this framework, Pollard must adduce evidence that (1) he is a member of a protected class, (2) he was meeting DCS's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *See McDaniel*, 940 F.3d at 368 (citation omitted). If he meets each element of his prima facie case, the burden shifts to DCS to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Pollard to submit evidence that DCS's explanation is pretextual. *Id.* (citation omitted).

As DCS points out, Pollard's discrimination claims fail because he hasn't identified any similarly situated employees who were not members of his protected class (whether based on race or sex) who were treated more favorably. *See McDaniel,* 940 F.3d. at 369 ("As [the plaintiff] has not identified any similarly situated employees to allow a factfinder to conduct a

9

'meaningful comparison,' his prima facie case for discrimination fails."); *Johnson*, 892 F.3d at 896 ("For purposes of Title VII, plaintiffs need to produce evidence that similarly situated non-African-American employees were treated more favorably.... And the plaintiffs have not done so."); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642-43 (7th Cir. 2008) (plaintiff's disparate treatment argument was untenable because she failed to satisfy the similarly situated prong); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690-91 (7th Cir. 2008) (same); *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751-52 (7th Cir. 2006) (same). Though DCS moved for summary judgment, it was Pollard's responsibility to make a showing sufficient to establish the existence of genuine triable issues. *See Johnson*, 892 F.3d at 896. In his response, Pollard doesn't identify any similarly situated employees who were treated more favorably than him. For this reason alone, his discrimination claims fail under the *McDonnell Douglas* framework.

But even had he identified similarly situated others, Pollard has additional issues. DCS contends that Pollard's discussions with Madison and with his coworkers violated its policies and thus Pollard was not meeting DCS's legitimate job expectations. When a defendant employer argues "that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the [satisfactory-work element] of the plaintiff's prima facie case and the pretext analysis." In such cases, the Court "may skip the initial burden shifting of the [*McDonnell Douglas* approach] and focus on the question of pretext." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007).

At this stage, the question is not whether DCS's decision was right, but whether Pollard presented sufficient evidence that DCS's reason was a lie for the action it took. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 ("[W]e look to 'whether the employer gave an honest explanation of its behavior.'") (quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th

10

Cir. 1987)). The Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

On this score, Pollard comes up empty. He has designated no evidence to discredit DCS's explanation for his discharge. What he does do is dispute the facts in the investigation but even that doesn't help him. Pollard confirmed and admitted making many statements attributed to him. While he may dispute the context of the statements or contend that he was "joking" when he made some of the statements, he does not dispute the fact that the statements were made and DCS believed they were unprofessional and violative of its policies. Pollard has not set forth a genuine issue of material fact that DCS's legitimate nondiscriminatory reason for discharging him was a pretext for race or discrimination. For this reason, DCS is entitled to summary judgment on Plaintiff's race and sex discrimination claims.[6]

## CONCLUSION

For the reasons above, DCSs Motion for Summary Judgment (ECF No. 54) is GRANTED. Plaintiff's Motion to Compel (ECF No. 61) and DCS's Motion to Strike (ECF No. 66) are DENIED. The CLERK is DIRECTED to enter judgment in favor of the Defendant and against Plaintiff.

SO ORDERED on March 2, 2023.

s/ Holly A. Brady  
JUDGE HOLLY A. BRADY  
UNITED STATES DISTRICT COURT

---

[6] Even under the *Ortiz* holistic approach, Pollard's discrimination claims fare no better. Under *Ortiz*, the court must determine "whether the evidence would permit a reasonable factfinder to conclude" that Pollards's race or sex, "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. The record, even when read favorably to Pollard, demonstrates that DCS received a complaint about Pollard, investigated that complaint and terminated him based on the facts obtained during the investigation. There is nothing in the record (outside of the fact that Pollard happens to be a black male) that suggests Pollard's status as a black male motivated the termination decision.